DYGERT *vs.* SCHENCK.

Where the owner of land over which a public highway passes, digs a race-way across the road to conduct water to his mill, and builds a bridge over the race-way, and an injury is sustained by any one in consequence of the bridge being out of repair, such owner is liable in damages to the party aggrieved.

*It seems* the owner of the soil may for such purpose dig a race-way across a public road, but he must restore the road to a travelling condition ; and if an injury occurs, though he uses the utmost care to prevent it, he is liable in damages, unless the party injured is chargeable with *gross negligence.*

The right of the owner depends upon mere *sufferance ;* whenever an injury occurs, the race-way will be adjudged a *nuisance,* and the principle *nullum tempus occurrit reipublicæ* will be applied.

*It seems* that where a bridge is built by an individual over a *natural stream,* for his own benefit, if the bridge be of *public utility* and is *used by the public,* the public are bound to keep it in repair ; but not so when the *necessity* for the bridge is created by the individual.

ERROR from the Montgomery common pleas. Dygert sued Schenck in a justice's court, and declared against him in an action on the case, for an injury to a mare occasioned by her falling through a bridge which was out of repair, and which it was the duty of the defendant to have kept in repair. The plaintiff recovered in the justice's court, and the defendant appealed. In the C. P. it appeared that about 1826, the defendant dug a race-way across a public road, to conduct water to his mill, and built a bridge across such race-way, *which ever since has been used by the public as a part of the road.* The highway passed over the land of the defendant. In the autumn of 1837, a mare of the plaintiff fell through the bridge, in consequence of the plank, the flooring of the bridge, being loose, and received great injury. On the plaintiff resting, the defendant moved for a non-suit on the grounds : 1. that the plaintiff had not proved *enough to en- [ *447 ] title him to recover, and 2. that the plaintiff was not entitled to recover damages against him, he *not being bound to keep the bridge in repair.* The C. P. sustained the motion on both grounds, and *nonsuited* the plaintiff, who thereupon sued out a writ of error.

*A. Hees,* for plaintiff.

*H. Loucks*, for defendant.

*By the Court*, COWEN, J.   The evidence was clearly sufficient to go to the jury upon the question whether the injury arose from the cause alleged ; and the nonsuit cannot be sustained, unless the obligation to keep the bridge in repair had devolved on the town.

The defendant certainly committed no trespass in digging the ditch.   It was on his own soil.   The only right adverse to his was one to have a common highway for the purposes of travel.   All the public could require was, that he should make and keep the road as good as it was before he dug his ditch.   That he accomplished by building a substantial bridge originally, which did not get out of repair for a number of years.   The road, however, in the end, proved to be less safe than it was when the bridge was first built, certainly less so than before the ditch was dug.   In suffering this, the defendant came short of his obligation to the public.   Any act of an individual done to a highway, though performed on his own soil, if it detract from the safety of travelers, is a nuisance.   *Edmonds, senator, in Hart v. Mayor, &c. of Albany*, 9 *Wendell*, 607, *and the books there cited.*   A ditch dug in a public highway was specifically pronounced to be such by Savage, Ch. J. in *Harlow v. Humiston*, 6 *Cowen*, 191, and Sutherland, J. in *Lansing v. Smith*, 8 *Cowen*, 152.   Special damage arising from it, therefore, furnishes ground for a private action, without regard to the question of negligence in him who digs it.   The utmost care to prevent mischief will not protect him, if the injury happen without gross carelessness on the side of the sufferer.   *Harlow v. Humiston*, 6 *Cowen*, 189, 191.   Caution is [ *448 ] a *defence predicable of him only who is in legal pursuit of his own business, or engaged in the legal use of his own property. The moment a plank became liable to slide from the bridge, or any other serious difference arose against its safety, as compared with the original unbroken ground, the ditch took the character of a nuisance.   The plea could only be, in substance, " true, I was committing a crime against the public : but I took every precaution that it should not injure the plaintiff personally." Was such a defence ever heard of ?

It is impossible to maintain, as the defendant's counsel has attempted to do, that ditches may be thus dug by owners for their own benefit, and the bridges over them be made a charge to the town, in consequence of a few years' indulgence on the part of the public.   The travelling being in the mean time made perfectly safe by the owner of the bridge, there is nothing adverse to the common interest which presses for interference by indictment, or under the statute.   1 *R. S.* 517, 521, 2d ed. § 106 *and* 135.   The affair, therefore, lies along, almost of course, by mere sufferance, till the bridge becomes a nuisance.   It is then in perfect season to correct the evil by the usual remedies.   The fair construction of the delay and acquiescence is,

that the person digging the ditch has been allowed to hold on at sufferance, because an indictment or other prosecution would appear to be captious. Such a step would not be countenanced by the public while the injury is merely technical. No length of time will legalize a nuisance, for the very reason, that while it continues a mere trifle, no one thinks of taking measures to have it removed, and thus the public would be sure to suffer. *Vid. per Lord Ellenborough, C. J. and Lawrence, J. in Weld v. Hornby, 7 East, 199, 200. Folkes v. Chad, 3 Doug. 340, 343, is in point, both for argument and authority. Nullum tempus occurrit reipublicæ applies with unmitigated force against a public nuisance.*

Had the town agents actually taken the bridge under their care, and repaired it for a long time, there might have been a question for the jury whether they had not made it *a town bridge. But no such [ *449 ] evidence was given. The case is entirely different from that where an individual builds a bridge over a natural stream. There it is not necessary for his own purpose merely; and if the public use it, there is certainly no reason for the town declining to keep it in repair. The obligation to do so is no less cogent, at least, than if they had also been put to the expense of erecting it in the first place. The case can be made in no way stronger for the defendant here, than it was for the Buffalo Hydraulic Company in *Heacock v. Sherman, 14 Wendell, 58, 60.* In that case, the present chief justice declared, after looking into the authorities, that the duty of repair lay upon the company; and that if the action had been against them instead of a stockholder, they could not have escaped damages for any private mischief occasioned by it; yet it was lawful, though in the highway, being in that case authorized by an act of the legislature.

The counsel for the defendant insists that he, being owner, had the exclusive right to enjoy and make any use of his land not inconsistent with the public use of the easement, and cites *15 Johns. R.* 452, 491; 12 *Wendell,* 98; 1 *Cowen,* 238. In admitting the defendant's right to dig this ditch, I have conceded all that his counsel claims; and I am quite sure all that can be claimed by any of the numerous authorities announcing the relative rights of owner and government in a highway. The difficulty lies in the bridge being dangerous, a thing clearly inconsistent with the public use, unless kept perfectly safe.

The general duties of commissioners and overseers to keep bridges in repair is next insisted on at length, and need not be denied. The answer has already been given, viz. a bridge erected exclusively for private benefit makes an exception. The duties of these officers, as prescribed by positive enactment, are embodied in *R. S.* 500 *to* 505, 2d ed. *pt.* 1, *ch.* 16, *tit.* 1. *art.* 1 *and* 2. The commissioners are to cause the highways and bridges, which are or may be erected over streams intersecting highways, to be kept in repair. § 1, *sub.* 4. This is in general to be done through orders to the overseers. *Id. sub.* 5, 6, 7, § 6, *and* § 16, *sub.* 1.

[ *450 ]    Specific *remedies are provided for neglect. § 17 *and* 18. But beside, an obligation by § 6, *sub.* 1, at once attaches to the overseer, and he is bound on notice without waiting for orders, to remove obstructions and do any other acts necessary to keep highways within his district in convenient repair, *McFadden* v. *Kingsbury*, 11 *Wendell*, 667 ; and in *Bartlett* v. *Crozier*, 15 *Johns. R.* 250, he was held punishable by action at the suit of a private person who suffered by his neglect to repair a bridge. *Vid. Cowen's Treat.* 181. The case cited was reversed by the court of errors, for want of an absolute duty being shown. That court did not, however, as the counsel supposes, deny that neglect of public duty, by which a man is injured, would furnish ground for a private action at his suit; not even in a case where the statute has imposed a penalty for neglect. These statutes and other books are cited in connection with *The King* v. *Inh. of the West Riding of Yorkshire*, 2 *East*, 342, and various cases in the notes by Mr. East, which, taken together, make an important body of reasoning and authority on the distinction between public and private obligation in the reparation of bridges. The close of the marginal note to the principal case in *East* is thus: " If a bridge be of public utility, and used by the public, the public must repair it, though built by an individual ; *aliter* if built by him for his own benefit, and so continued without public utility, though used by the public. A bridge built in a public way without public utility is indictable as a public nuisance ; and so it is, if built colorably, in an imperfect or inconvenient manner, with a view to throw the *onus* of building or repairing it immediately on the county." Our attention was specially directed by the argument to Mr. East's closing note, *p.* 356, (*a*), being a report of *The King* v. *The Inh. of Glamorganshire*, who were indicted for not repairing a bridge built by Mackworth, as they insisted, for his private benefit. So indeed it was, but at the same time it was of great public utility. He built it across the river Tave, which intersected the highway, as a passage to his tin works, indeed ; but it was not merely illegal, it was ungenerous in the county, for that reason merely, to insist on his bearing

[ *451 ]    the exclusive *burthen of repairs, or indeed any burthen. The note (*a*) at *p.* 353, *The King* v. *The West Riding of Yorkshire*, establishes the general doctrine, that a bridge used by the public is *prima facie* to be repaired by them, though built by an individual ; and to escape that obligation, it lies with the public to show that it rests on another. *Rex* v. *The same*, 5 *Burr.* 2594, maintains the same distinction.

Such authorities as these certainly have abundant application to the principal case ; but of course, would not, as they all have been cited by counsel for the defendant, except upon the assumption that the bridge now in question must have been at least of some little public utility ; whereas the very necessity for its erection arose out of a nuisance which was the work of the defendant himself. The whole object of the bridge was to protect him-

self.  Things began and ended in himself ; the land, the mill, the water, the raceway, the profit, and therefore the bridge.  The public could derive nothing but mischief.  It was not a case in which the town could be put to show a prescriptive exemption from a presumptive obligation to repair.  No such presumption ever arose.  If any doubt could remain, take the following literal translation from 1 *Roll. Abr. fol.* 368, *tit. Bridges, pl.* 2 :  " If a man erect a mill for his single profit, and make a new cut for the water to come to it, and make a new bridge over it, and the subjects use to go over it as over a common bridge, this bridge ought to be repaired by him who had the mill, and not the county, because he erected it for his own benefit."  He cites from a manuscript case of 8 *Edw.* 2, the beginning of the 14th century.  The case is a literal description of the one before us ; and is commended no less by its antiquity, than by its sound sense, and the whole course of authority ever since.

Among other grounds, it is supposed that the plaintiff was tied up to his remedy for the penalty given by 1 *R. S.* 517, 2d ed. § 106, or to the treble damages of *id.* 521, § 135.  These provisions are merely cumulative.  The first would afford no redress for the private injury ; and it would be a singular doctrine that a party shall not waive treble damages given for his own benefit.  A statute gives treble damages *for a tres-    [ *452 ] pass : was it ever doubted that a party might waive the penalty, and sue for single damages, in despite of his antagonist ?  It is supposed that *Bartlett* v. *Crozier,* 17 *Johns. R.* 439, gives countenance to such a conclusion.  But no case or argument to that effect can be made to bear the color of law.

There was no pretence, as is supposed, for imputing gross negligence to the father of the plaintiff below, who was driving his mare.  No doubt the doctrine is well settled and rational, that, though the defendant obstruct the highway, yet if the plaintiff seeing, and being able to appreciate the danger, run into it, when he might easily have avoided it, he cannot recover.  The cases cited to show this, are *Butterfield* v. *Forrester,* 11 *East,* 60, and *Harlow* v. *Humiston,* before cited ; but they do not apply.

We are clear that the rights and obligations of the parties were entirely misapprehended by the court below.  The judgment must therefore be reversed.