CROSS vs. THE MAYOR, RECORDER, ALDERMEN, AND COMMON COUNCIL OF MORRISTOWN.*

1. The general act relating to roads, does not apply to towns or cities the charters of which confer on the corporations the authority to regulate the streets.

2. Where the charter of a city empowers the common council to regulate the public streets by ordinance, an alteration of the carriage-way or sidewalks cannot be made by the municipal authorities without the passage of an ordinance for that purpose.

3. An encroachment upon a street or public highway cannot be legalized by the mere lapse of time.

4. Where the city authorities widened the carriage-way and cut down the sidewalk of a public street, without pursuing the formalities prescribed by their charter, it was held that such acts, not operating as irreparable injuries to the complainant, who was the owner of a house and lot on such street, did not form the basis for an injunction; the same being merely trespasses and remediable as such.

The bill in this case was filed by the complainant in behalf of himself and such other owners of lots on South street, in Morristown, as might come in and claim relief, &c.

The principal matters stated in the bill were these: that the complainant was the owner of a lot of land, on which was a dwelling-house and other buildings; that said dwelling-house stood back fifteen or twenty feet from the street fence, which fence had been erected in its present position about twenty-six or twenty-seven years ago, and had been maintained in the same place ever since its erection; that complainant had a sidewalk in front of his said lot between the said door-yard fence and the wagon-way of said South street, and not over seven or eight feet in width, and that said sidewalk had been of its present width for twenty years last past, and longer, &c.; that at the outer edge of said sidewalk complainant had growing on his own land four valuable shade trees; that said South street commences at the southerly corner of the public square in Morristown, and

---

* CITED in Tainter v. Morristown, 4 C. E. Gr. 47, 60; 4 Vr. 61; State v. Troth, 5 Vr. 379; State v. Trenton, 7 Vr. 201; Hoboken L. & I. Co. v. Hoboken, Id. 549.

continues thence in a southerly direction for nearly half a mile; that said South street was an ancient highway, but had never been laid out by surveyors of the highways; that until the year 1865 Morristown was not incorporated. The bill then sets out at length sundry provisions of the act of incorporation, and its supplements, and avers that the Common Council has never passed any ordinance authorizing the widening said South street, or the sidewalks thereof, nor the removal or destruction of any shade trees between the wagon-way and sidewalks along said street, nor the removal of any door-yard fences standing between the sidewalks and the houses along said street.

The bill further charges, that the Common Council caused a survey to be made of South street, and sets out, with great particularity, the lines of the street as located by said survey, showing that it makes the said street to embrace a portion of most of the door-yards bordering on said street; and that, on the twenty-ninth of October, 1866, a notice was served on complainant, by the order of the Common Council, to the effect that the fence on his lot stood between five and six feet into the street, and requesting its removal, &c.; and that notices of a like character had been given to the other land owners whose fences were thought to encroach on the street.

The bill further charges, that the Common Council has determined to make said South street conform to said survey, and to widen the road-way, and in pursuance of such intent has commenced operations; that, besides widening the carriage-way, said Common Council is altering the grade of said street, so that in front of complainant's lot the street had been lowered about one foot; that, in widening said carriage-way, the sidewalks along said street have been considerably narrowed and made unfit for use; and that the line of the work in extending the carriage-way comes inside of the shade trees of complainant and those of the other land-owners; and that the shade trees will be dug up, or their roots will be so much uncovered as to kill them.

The prayer of the bill was for an injunction to restrain the

municipal authorities from widening the carriage or wagon-way in said street, from narrowing the sidewalks thereof, from digging up or uncovering the roots, or in anywise injuring any of the shade trees, &c., and from removing, disturbing, or injuring any of the door-yard fences along said street, &c.

To this bill the defendants filed an answer, the substance of which sufficiently appears in the opinion of the court.

The cause came on for argument on a motion to dissolve the injunction, before the Chief Justice, sitting as statutory master, during the absence of the Chancellor from the state.

*Mr. Pitney,* in support of the motion.

*Mr. Vanatta,* contra.

THE CHIEF JUSTICE, sitting as Master.

When the bill in this cause was filed, the municipal authorities of Morristown were in the act of altering the grade of one of the principal streets of said town, called South street, and of widening the wagon or carriage-way of such street. In the doing of this work they had encroached on the sidewalks, as before established, and had dug away the earth around the shade trees standing along the outer edge of such sidewalks. The complainant is the owner of a lot and dwelling-house upon this street, and this property was subjected to this treatment at the hands of the corporate officials.

Anterior to this course of action on the part of the town, the Common Council had caused a survey of this street to be made, and finding as they supposed, that most of the owners of lots, among whom was the complainant, had encroached upon the street, had caused notices to be served on such persons, informing them of such fact, and requesting them to move back their fences and thus give to the street its proper bounds.

After a careful examination of the various legislative enactments which incorporate Morristown, or which confer upon

it supplementary powers, I am entirely satisfied that, taken in a purely legal light, the acts of the town above enumerated are not to be justified. It is true that by the statutes referred to, very ample power to regulate the streets and sidewalks has been given to the municipality. The right thus conferred is certainly adequate to enable the town to prescribe the grade and the width, both of the carriage-ways and of the sidewalks. On the argument, indeed, it was insisted that by the act of the fourteenth of March, 1851, (*Nix. Dig.* 751 *), every owner of a lot adjoining on a public highway has a right to have sidewalks " not exceeding in width one fifth, on each side of the road, of the width thereof," and that the dimensions of such sidewalk could not be curtailed against his wishes. But this act is, in substance, a supplement to the general law of the state concerning roads, and, like that law, does not apply to towns or cities, the charters of which confer on the corporation the authority to regulate the streets. By the fifty-first section of the act relating to roads, it is declared, in express terms, that whenever the word " township is made use of in the act, it shall be construed to comprehend precinct, ward, city, borough, and town corporate ; " and the effect of the provision is to carry the entire system, embodied in this general statute with regard to making and repairing highways, into towns corporate and cities, in the absence of superseding regulations in their respective charters. But it has never seemed to me a matter susceptible of doubt, that in case a city charter contains a special provision, putting the streets in charge of the officers of the corporation, such provision excludes the common scheme for constructing and keeping up highways in the townships, and all its concomitant regulations. In conformity with the well known rule of law, the general legislation on the subject gives place to the special legislation on the same subject. I have no difficulty, therefore, in holding that the entire control over the public streets of Morristown, except it may be with respect to the laying out of new roads, resides exclusively in the local cor-

* *Rev.,* p. 1009.

poration, and that such corporation has the indisputable right to prescribe the grade to the streets, and the width of the carriage-ways and of the sidewalks.

But notwithstanding this conviction, in my opinion, as has been already observed, the alterations made, as well as those attempted to be made in South street, are not to be legally vindicated. No doubt they were well intended, and designed to promote the public welfare. The illegality consists in doing the work in the absence of a town ordinance on the subject. The charter is explicit with respect to this matter. In unambiguous language, the grant of power is to the Common Council, to pass ordinances to regulate the sidewalks and streets. The power is undoubtedly conferred, but the mode in which that power shall be exercised is prescribed, and the consequence is, such mode must be pursued. No material alteration can be legally made in any street within the corporate limits, either with regard to its grade or the width of its carriage-way or sidewalks, except by force of a by-law of the Common Council, describing, with intelligible particularity, the alteration to be made. Nor is this an unusual provision; it is to be found in the charters of most of the municipal corporations of this state. Nor is it an inconsiderable one, for it is obviously highly important that all substantial modifications of the public thoroughfares should be made with care, and after due deliberation, and that before their execution they should be made known to those whose property or convenience is, oftentimes, to be very materially affected by them. As therefore, the answer of the defendants in this case admits that the proceedings in question took place without the sanction of an ordinance of the Common Council, I am constrained to regard such proceedings as violations of law.

But this conclusion does not, by any means, settle the point as to the right of the complainant to retain the injunction which he has obtained. His rights of property have, undoubtedly, to some extent been invaded. The question then arises : is that invasion of a character to justify the in-

terference of a court of equity ?   To answer this inquiry, it
is necessary to ascertain with precision the rights which have
been infringed, and the nature of such infringement.

In the bill of complaint, the most serious of the grounds
for apprehension on the part of the complainant, appears to
be the action of the Common Council in directing a survey of
South street, and the consequent notices to the lot owners to
remove their fences, regarding them as encroachments.   By
the seventh section of the supplement to the charter of the
town, passed March 15th, 1866, it is recited that " there are
several roads, highways, and streets, within the said town of
Morristown, the lines of which have not been, and cannot be
certainly ascertained by reason of the indefinite surveys, plots,
and maps thereof," and it is thereby declared that, for the
purpose of settling such lines and courses, the Common Coun-
cil may appoint commissioners, who are empowered to make,
in a certain designated mode, a survey of the streets whose
bounds are thus unascertained.

There is no pretence that this statutable course has been
observed with respect to South street.   It is conceded that
no commissioners were appointed, and that all that the Com-
mon Council did was to cause one of their own officers to run
the courses of an old survey of the street, which had been
recently discovered upon the public records.   With regard to
this survey thus made, considerable evidence has been taken,
and from that evidence I am convinced that this street, owing
to the present obscurity as to the position of the monuments.
referred to in its original official location, requires, with pe-
culiar force, the application, for the ascertainment of its
proper bounds, of the method provided by the statute just
mentioned.   There is certainly a strong probability that the
survey which has been made, is a close approximation to the
actual lines of this highway, but the public has so long ac-
quiesced in these alleged encroachments, and such encroach-
ments are so numerous, that it appears eminently proper a
course should be taken which would conduce so much to re-
move uncertainties, and promote general acquiescence.   If

encroachments on this public street exist, such encroachments, no matter how ancient and long continued, are clearly public nuisances, and as such, are abatable.  The claim that this public easement has been curtailed by acquiescence and lapse of time, has no foundation in legal principle.  Such I have always understood to be the well established rule of law upon this subject.  In the case of *Fowler* v. *Sanders, Cro. Jac.* 446, it was substantially held that the common law presents no means (except an act of Parliament) by which a public right of way can be lost absolutely ; and this doctrine, so far as I am aware, has never been drawn in question by the decision of any English court.

The doctrine is embodied in the ancient maxim *" nullum tempus occurrit regi ;"* and it is applied for the protection of all public interests.  Thus, in general terms, it is said, " no person can prescribe against an act of Parliament, or against the King, where he hath a certain estate and interest, against the public good, religion, &c." *Jac. L. D., tit. King.* In its application to navigable rivers, this principle has been oftentimes asserted.  Thus, in *Vooght* v. *Winch,* 2 *B. & Ald.* 662, it was maintained that twenty years possession of the water of a public navigable river, at a given level, did not conclude the public. *Weld* v. *Hornby,* 7 *East* 195, was, in point of doctrine, to the same effect. And in *Chad* v. *Tilsed,* 2 *Brod. & B.* 403, a possession of forty years was relied on and was deemed insufficient by the court; Chief Justice Dallas remarking : " I agree that if the usage be only of forty years duration, and be applied to establish an exclusive right over an arm of the sea, this could not destroy the right of the subject." Nor do I think the authorities referred to on the argument by the counsel of the complainant are at all inconsistent with the decisions above cited ; for all such authorities related to presumed grants of crown lands and privileges from the sovereign in his individual capacity, and not to him in his character of *parens patriæ,* and as the repository of public rights.  It is true that, in this country, this rule of the common law has, in a few instances, been rejected, but nevertheless it is sus-

tained, I think, by a great preponderance of American au-
thority. " No laches," said Chief Justice Parsons, " can be
imputed to the government, and against it no time runs so as
to bar its rights." *Stoughton (town of)* v. *Baker et al.,* 4
*Mass.* 522. And in the more recent case of the *Common-
wealth* v. *Upton,* 6 *Gray* 476, the same court remarks : " It
is a positive rule of law, as reasonable as it is firmly estab-
lished, that no length of time will legitimate a nuisance, or
enable a party to prescribe for its continuance." The same
principle is put in force in the following cases : *People* v.
*Cunningham,* 1 *Denio* 536 ; *Mills* v. *Hall,* 9 *Wend.* 315.

And I regard it a mistake to suppose, as was done upon
the argument before me, that the rule in question originated in
the desire to extend unduly the royal prerogatives. Evidently
such was not the case ; but it proceeded from a regard to the
interest of the public, or great body politic. It is a principle
of policy, and appears to have been thought almost indis-
pensable for the protection of those privileges in which the
whole community is interested, and it may well be doubted
if it does not exist, in some form, in the jurisprudence of
every civilized people. " Thus," says *Domat, Vol.* 1, *p.* 492,
propounding the maxim of the civil law, " we cannot acquire
by prescription the things which nature or the law of nations
destine to a common and public use, such as the banks of
rivers necessary for navigation, the walls and ditches of towns,
and other the like places." This seems to place the doctrine
on the broad foundation of universal law ; and it seems to me
its absence from any legal system would be attended with
much inconvenience, for it is almost impossible to imagine
any scheme of supervision over public interests which would
be adequate for their protection against the constant and yet
almost imperceptible aggressions of individuals. Who is to
watch, for example, so as to detect, within a certain period,
all encroachments upon the innumerable public highways in
the state? or who is to keep a similar guard over all parts of
its extensive harbors and navigable rivers ? There is much
good sense in the remark of Chief Justice Cowen, contained

in his opinion in *Dygert* v. *Schenck*, 23 *Wend.* 448, that "no length of time will legalize a nuisance, for the very reason that while it continues a mere trifle no one thinks of taking measures to have it removed, and thus the public will be sure to suffer." In my estimation, the rule in question is highly reasonable as well as beneficial in its effects, and there appears, consequently, no reason why it should not be received with favor by the courts. I hold, therefore, that by the law of this state, the complainant cannot set up any claim, derived from a possession continued for over twenty years, to occupy any portion of the public street in question.

But as the true boundaries of this street are open to serious controversy, and as the possession of the complainant has been of such long continuance, it seems to me that the officers of the town, unauthorized to pursue such a course by any ordinance, would not be justified in entering upon the premises of the complainant and removing his fence as a public nuisance. If such was originally the intention of the town officers, the injunction in this respect was proper, and should now be continued. But, from the answer which has been put in, it now appears that this course was never in contemplation. The defendants expressly deny that they had any design to enter upon the complainant's property, or to disturb the fences in front of it, until the proper ordinances should have been enacted. It is, therefore, manifest that an injunction is not necessary for the protection of the complainant on this head.

The next ground laid in the bill of complaint for the summary interference of this court, consists in the allegation that the defendants design to destroy the shade trees in front of the premises of the complainant. A necessity to protect ornamental trees would afford an adequate motive for the action of a court of equity, for the loss of such property is deemed an irreparable injury. But in this respect also, the answer discloses circumstances which entirely destroy this basis of relief. The answer is complete to the effect that the defendants had no intention to destroy or injure any of these

trees. On the contrary, they show that they have not injured any tree along the whole line of the street; and that they have taken pains to avoid doing the least hurt to this species of property. This averment has not been controverted by any of the affidavits, and it consequently takes away all pretence of right to have the injunction continued on this ground.

The residue of the complainant's case is this: that the defendants have altered the grade of the street, have widened the carriage-bed, and cut away a portion of the sidewalk. It has already been said that, under present circumstances, such acts are legal wrongs, but I am entirely at a loss to see how they give to the complainant a right to relief in the form of an injunction. These are mere ordinary wrongs or torts, and the damage which they inflict it would be absurd to denominate irreparable. How, then, can this injunction stand? The rule is perfectly established, and never questioned, that in cases of this nature, a court of equity will never intervene where the remedy is adequate at law. The process of injunction has been called the strong arm of the court, and it has been often said that to render its operation useful it must be exercised with great discretion, and only when necessity requires. Nor am I aware of any class of cases to which it should be applied with greater caution, than to the proceedings of municipal corporations in the execution of public improvements. I have been referred to no case in which such a jurisdiction has ever been assumed. The right of this court to proceed by way of injunction, in an analogous case, was emphatically denied by Chancellor Green, and I entirely concur in the view there presented. The case referred to is that of *Holmes* v. *Jersey City*, reported in 1 *Beas.* 310.

In the present case, as now developed, there is no reason to suppose any great mischief is impending over the complainant. If he sustain any loss or damage, as apprehended by him, from any illegal act of the defendants, he can obtain ample redress by a suit in the ordinary mode, in a court of

law. This tribunal cannot properly take cognizance of ordinary trespasses to lands.

The injunction, therefore, must be dissolved, but, under the peculiar circumstances of the case, without costs.